MIDDLE DISTRICT, HARRISBURG, 1857.

## Bank of Gettysburg *versus* Thompson et al.*

1. If a creditor has in his hands the means of satisfying his debt and chooses not to retain it, but suffers it to pass into the hands of the principal debtor, the surety will be released *pro tanto*, unless he has consented to the conduct of the creditor.

2. The renewal of an indorsement of an accommodation note, if it be not the making of a new debt, is a distinct acknowledgment of an old one.

3. From each successive indorsement a perfectly natural presumption

---

* This case was again in the Supreme Court, and is reported post 119.

arises that the indorsers knew the sums for which the notes were respectively given to be due.

4. Equity never gives relief to a party who has slept upon his rights for a period so long, that his claim would have been barred in a court of law.

ERROR to the Court of Common Pleas of *Adams County.*
The plaintiffs in error were defendants below.
Assumpsit.

This suit was brought upon a note of which the followed is a copy :—

"$2014 94.　　　　　　　　　　　　　　May 15, 1849.
"Four months after date I promise to pay to T. Stevens, James A. Thompson, and R. Smith, or order, at the Bank of Gettysburg, two thousand and fourteen dollars and ninety-four cents, without defalcation, for value received.

　　　　　　　　　　　　　　　　M. C. CLARKSON."

Indorsed "Thaddeus Stevens,
　　　　　　James A. Thompson,
　　　　　　Robert Smith."
Protested September 18, 1849.
Credit April 1, 1851, $900 00.

The plaintiffs, now defendants in error, offered in evidence the note on which suit was brought, and rested their case.

The defendants alleged that they were excused from the payment of the note in question, because of the negligence of the bank in not collecting a note of Little, left as collateral security for the payment of a larger note in 1841, which was renewed from time to time, and the note in suit formed one of the series, &c., as set forth in their point, on which the court were requested to instruct the jury; and whether they were thus excused or not from the payment of the note in suit, under the facts disclosed, was the question in the court below and in this court.

The defendants then gave in evidence an assignment dated 6th of August, 1841, Michael C. Clarkson to Bank of Gettysburg :—

"I hereby assign to the Bank of Gettysburg, a note on David Little for 550 dollars, with interest from Dec. 25th, 1839, the amount of this note and interest, or so much as may be collected, deducting any expense the bank may incur in collection, to be credited on a note in bank for $7,500, drawn by me, and indorsed by T. Stevens, J. A. Thompson, and Robert Smith.

　　　　　　　　　　　　　　　　M. C. CLARKSON."

Other securities to the amount of about $4,500 were assigned to the bank as collateral, which were afterwards returned to Clarkson.

[Bank of Gettysburg *v.* Thompson et al.]

David Little, sworn.—I signed the note in the assignment mentioned, the Little note; at this time and at 6th of August, 1841, I carried on coach-making extensively; at that time, and for some years afterwards, I had a stock of 10 to $12,000, the estimate of my stock, carriages, and debts due me up to 1846 was that amount, $12,000; the amount of sales were from $20,000 to $25,000. I paid a large amount of debts up to the time I failed; gave a great many notes, and paid them off when demanded of me.

I failed in 1846, my property was levied upon; I have not been able since then to pay any of my debts; have not more than supported my family; have not since that time. Since then I have been pretty much deeply involved in old debts; I can't say I was able to pay all my debts in 1841. The bank lost by me may be $500 or $600; Clarkson indorsed some for me; I don't know whether I gave him my notes to receive money upon for me at Gettysburg Bank; I expect there was some sent to the Gettysburg Bank in 1841, and protested; can't tell whether ten or forty notes were sent in 1841, and protested at Gettysburg; can't tell how many were sent and protested in 1842; can't tell the number or amount in either year. I paid notes that were left with lawyers and justices in 1841—in 1845 a considerable sum, upwards of $2,000. My property in 1846 was a tolerably good stock, and about fifteen to twenty finished and unfinished carriages.

W. W. Paxton, Esq., sworn.—I was a magistrate from 1841 to 1845, and find that in looking over my docket I collected $823 30 by what I have seen; I think there were others; a suit was brought by the bank against Mr. Little & Hanaway; it was paid.

Thomas Warren, sworn.—I had dealings with Little from 1841 to 1845. In December, 1842, he paid me $245, the balance afterwards, in all $1,165; the balance in December, 1845, about $200. I lived here from 1841 to this time; from 1841 to 1845 Little generally had a large stock of carriages on hand.

George Arnold, sworn.—Little dealt with me from 1841 to 1846, more or less every year; he closed his account in 1843 with me; he fell in debt $486 and some cents, and gave me a due bill for that, and paid me in 1844; our dealings in the course of the year was three or four times the amount of the note.

The bank never gave credit for the said note of Little, and the note became worthless by reason of the neglect to collect it when it became due.

The court, Fisher, J., charged the jury, "that by accepting the assignment (of Little's note) the bank bound themselves to

use diligence in the collection of this note, and if the bank neglected to bring suit upon it when it became due, or otherwise secure it, and that in consequence of their neglect to sue it, when it became due, it was lost in consequence of the failure of Little, that the bank must bear the loss," &c.

This was assigned for error, and raised the question before the Supreme Court for adjudication.

*Wills* and *Hepburn* for plaintiffs in error.

*McConaughy* and *Miller* for defendants in error.

The opinion of the court was delivered by

BLACK, J.—In the year 1838, one Clarkson made a note for $20,000, payable to Stevens, Thompson, and Smith, who indorsed it to the Bank of Gettysburg. The note was several times afterwards renewed, and payments made on it from time to time, until in 1851, it was reduced to $7,500. At that time the maker of the note assigned to the bank, as collateral security, a note for $500 on David Little, and other paper, valued altogether at nearly $4,500. The note against Little was lost by the negligence of the bank, and the other collaterals were handed back to Clarkson. When the note for $7,500 became due, namely on the 9th of October, 1841, a payment was made on it which reduced it to $5,435. This was renewed at successive periods of thirty days each, until the 8th of March, 1842, when, as the witnesses for the defendants swear, it was all paid off, and a new discount obtained on a new note indorsed by the same persons for $1,540. This note was again renewed from time to time, until the 27th of October, 1844, when it was protested and lay over until the 25th of October, 1845.

Then a new note was given for the amount of principal, and another for interest and costs. After several renewals and protests, the present note was given on the 15th of May, 1849, for $2,014 94, the amount of principal, interest, and costs on both the notes last mentioned. This suit was brought against the indorsers in 1852. The defence they set up is, that the bank, in 1841, had in its hands collaterals sufficient to pay nearly $5,000 of the debt, but suffered a portion of them to be lost for want of diligence, and gave the rest up to the principal debtor, in prejudice of the indorsers' rights.

Nothing can be better settled than the rule of law which declares that if a creditor has in his hands the means of satisfaction, and chooses not to retain it, but suffers it to pass into the hands of the principal debtor, the surety shall be released *pro tanto,* unless he has consented to the conduct of the creditor.

The jury were also properly instructed, that if the note now in suit was not a continuation of the one exist*ing* when the collaterals were given up, the defence was not available, whatever it might have been under other circumstances.   Thus far, the defendants had nothing to complain of.   But there was no evidence how or wherefore the collaterals came to be given up. The fact was proved, but nothing more.   One of the indorsers was president of the bank.   At the next renewal of the note afterwards, it was reduced by a payment of nearly $2,000 and a few months later another payment of $4,000 was made.

It is not at all improbable that Clarkson raised the money out of the collaterals, and that they were given to him for that purpose.   If so, the indorsers owe the reduction of their liability from $7,500 to $1,500 to the matter which they now allege as a reason for releasing them from the balance.   From the time of the first renewal, after giving up of the collaterals until the making of the present note, there passed a period of eight years; and there were so many intermediate renewals that I have not thought it necessary to count them.   After such a lapse of time, accompanied by such circumstances, upon which party does the burden of proof lie to show the nature of the transaction?

When a person renews his indorsement of an accommodation note, if it be not the making of a new debt, it is certainly a very distinct acknowledgment of an old one.   From each successive indorsement, a perfectly natural presumption arises that the indorsers knew the sums, for which the notes were respectively given, to be due.   Shall these admissions, repeated probably thirty or forty times, be counted for nothing, and the bank be called to prove that a previous transaction was not a fraud on the indorser's rights?   It may be, that the collaterals were given up without the consent of the indorsers—that the proceeds of them were not collected and applied by the principal debtor to their relief, and that they made all their subsequent indorsements in ignorance of the truth; but, if the case was so, we think it lay upon the defendants to make it out. All men of sound mind are supposed to understand their own business, and to know what they are doing, especially when they are making a promise to pay money.   The best man, indeed, may make a mistake, or become the dupe of an impostor. But we cannot presume that there was either fraud or mistake in a matter like this, without some proof.

There is another difficulty about the case of the defendants. They admit their legal liability, but appeal to the equitable jurisdiction of the court for relief, on the ground of their own mistake and the fraud of their adversary.   But equity never gives relief to a party who has slept upon his right for a period

[Thompson et al. *v.* Bank of Gettysburg.]

so long that his claim would have been barred in a court of law. A chancellor acts upon presumptions which are in strict analogy to the statute of limitations. The transactions relied upon here occurred in 1841. Immediately after its occurrence, the defendants admitted impliedly that it was no defence; and they continued to repeat the admission, at short intervals, for eight years. Of course, I do not say that the equitable matter of every defence in an action of assumpsit must be dated within six years before suit brought or before plea pleaded.

But where the defendant has constantly acted, for the full period of six years, in a manner inconsistent with his defence, he cannot set it up any more than he can set up a counter claim, barred by the statute. A party who alleged a constructive release to be established by facts which are capable of a different explanation, must take his stand when the matter is fresh. He cannot be permitted to lie by and renew his promises continually for eight years, until the creditor has lost his evidence, and then turn upon him with a defence previously kept out of sight.

These principles embrace the ground covered by the note against Little, as well as the collaterals which were delivered to Clarkson. None of the transactions of 1841 can now be used to resist the plaintiff's claim without violating the rules of law and equity.

Judgment reversed, and *venire de novo* awarded.